L. Gilbert COHEN, Plaintiff,

v.

CURTIS PUBLISHING CO., Curtis Circulation Co., Time, Inc., Life Circulation Co., Cowles Magazines, Inc., The Hearst Corporation, Newsweek, Inc., Defendants.

No. 4-60 Civ. 265.

United States District Court
D. Minnesota,
Fourth Division.

June 1, 1962.

Edward J. Schwartzbauer, Dorsey, Owen, Marquart, Windhorst & West, Minneapolis, Minn., for movants in support of motion.

L. Gilbert Cohen, pro se in opposition.

NORDBYE, District Judge.

This action comes before the Court on the motion of defendants Time, Inc. and Life Circulation Co. for a summary judgment in their favor.

Life Circulation Co. is a wholly owned subsidiary of Time, Inc. and handles the nationwide subscription activities of the parent company. They will be referred to herein as Time and Life.

Plaintiff alleges in his complaint, among other matters, the following:

"23. The defendants named herein have by conscious concert of action and also by express agreement between themselves combined and conspired to continue and do continue at the present time the operation of the conspiracy in violation of the antitrust laws hereinbefore mentioned to exclude this plaintiff from the sponsored circulation market for magazine subscriptions.

"24. The defendants herein have by conscious concert of action and also by express agreement between themselves combined and conspired to continue to the present time their illegal acts in violation of Sections 1 and 2 of the Sherman Act and Clayton Act, Section 1 et seq. to prevent plaintiff from engaging in the magazine subscription business in the sponsored circulation market by

means of (a) boycott; (b) price discrimination; and (c) allocation of markets.

"25. The defendants herein and each of them, are engaged in a continuous conspiracy contrary to the provisions of the Sherman Act and Clayton Act to give Curtis and Look a monopoly of the sponsored circulation market for magazine subscriptions.

"26. By combination, conspiracy acts and practices of the defendants referred to and set out above, the defendants have unreasonably and do unreasonably restrain trade and commerce among the several states in the magazine subscription business in the sponsored circulation market in violation of Section 1 of the Sherman Act.

"27. By combination, conspiracy acts and practices of the defendants referred to and set out above the defendants have combined to monopolize, have attempted to monopolize, have monopolized and do monopolize trade and commerce among the several states in the magazine subscription business in the sponsored circulation market in violation of Section 2 of the Sherman Act.

"28. The violation of the antitrust laws by the defendants referred to and set out above, and the acts and practices forbidden by the antitrust laws committed by the defendants and referred to and specified above, have injured and damaged the plaintiff in his business in the aggregate amount of $300,-000. Three times that amount is $900,000."

■ In considering this motion, the Court is fully aware that a summary judgment should be granted with caution and only where the movants have established the nonexistence of any genuine issue of fact. The showing made likewise must be construed in the light most favorable to the plaintiff. Moreover, the plaintiff should be accorded any and all favorable inferences that may be deduced from the showing. It is with these principles in mind that the Court approaches the question as to whether or not these two movants are entitled to the relief which they seek.

■ In 1954 or thereabouts, plaintiff, who was a retired salesman aged approximately 76 years, devised a plan for selling magazine subscriptions to physicians and surgeons with the proposal that 20 per cent of the subscription price of a magazine should be set aside as a fund for loans to bright but needy young men who intended to take up the medical profession as a career. Plaintiff had had some background in magazine selling and apparently sensed the appeal that might be made to many doctors throughout the Nation who usually keep a supply of magazines in their waitingrooms. A magazine selling plan which afforded the opportunity to doctors to assist needy medical students by a loan fund donated from the amounts they paid for such magazine subscriptions, but without any extra cost to themselves, would seem to be reasonably attractive to the medical profession. But obviously the higher commission rate demanded by plaintiff in many instances under his plan would have no particular appeal to the magazine publishers whose magazines already were to be found in the doctors' waitingrooms. Whether this was a sound magazine selling plan or not, it is evident, and wholly uncontradicted, that plaintiff was not able to promote his project successfully.

At the outset, plaintiff endeavored to enlist the cooperation of the University of Minnesota Medical School, but that proved unsuccessful. However, he contends that he did obtain authority from the District Manager of Curtis Publishing Company, one of the defendants, to sell a large number of magazines, which are listed on page 6 of his complaint. It is contended that Curtis agreed to

give a 55 per cent commission on its own publications and 45 per cent on others. The list, however, does not include any of the publications of these two movants. It appears that in about 1955 plaintiff solicited some 1,800 Minnesota doctors for their magazine subscriptions, with the provision that 20 per cent of the subscription price would be paid to the University of Minnesota. As a result of this endeavor, he obtained subscriptions in the amount of somewhat less than $500. However, none of these subscriptions were for the publications of these movants.

In the summer of 1956, plaintiff sent out a description of his plan to various medical publications, apparently with the idea of obtaining publicity for his proposed plan of magazine solicitations from the medical profession. In his circular, he listed a number of "leading publications which make this project possible." Neither Time nor Life is listed as a so-called sponsor. It appears that this pamphlet sent out to the various medical publications came to the attention of the Central Registry, which is alleged to be a voluntary association of magazine subscription agencies. On August 17, 1956, a Mr. Morrow, the Secretary of that organization, sent a copy of plaintiff's circular to the Central Registry members with the statement that "We thought you would want the above information." Plaintiff contends that this notation by Mr. Morrow was one of the steps taken to further the conspiracy which he charges herein. However, there is no showing that the memo of Mr. Morrow was sent either to Time, Inc. or Life Circulation Co.

The relationship between plaintiff and these moving defendants as to the former's sponsored circulation plan may be, in part, at least, gathered from the correspondence between the parties. It was on August 13, 1956, that plaintiff wrote to Mr. Hallenbeck, Circulation Manager of Life Magazine, and President of Life Circulation Co., and stated in part as follows:

"First let me introduce myself. I am close to 70 years young and since retirement is tough, I have decided to try circulation work, but not as a canvasser. I have done that plenty in my day, but after getting used to bigger things one just can not solicit subscription for magazines, no more than he could peanuts and pop corn."

Then after briefly outlining his plan and asking for a commission of 40 per cent on all of Time and Life publications, he stated,

"I need the rate I ask because I am paying a straight 20%. It has to be 20% since I have to allow that to the organization I work with. I can use Time and Life in my business and I agree it would be helpful to be able to include it in my list. But,—I can get along without them."

On September 21, 1956, he wrote to a Mr. Powell, Manager of Agency Division of Time, in part as follows,

"I note in yours of August 30, that I can get better rates when I first show production. I can not show production because I am not the usual so called bell ringer. I try to work out a plan to get volume. It is either a flop (which most often it is) or it is some kind of a success."

Again, after outlining a so-called million dollar medical scholarship plan, he stated,

"Now, I need Life and Time and I want $50%, whether it be one year, two or three years or Xmas gift subscriptions. I will phone you next Tuesday (charges reversed) and I hope that you will accept the call since time is running fast."

On October 27, 1956, he again wrote to Mr. Powell, stating, in part,

"You recently wrote me that your wholesale rate was withdrawn because I did not produce. That is correct. I did not produce because I am not a canvasser myself,—any more. I did much of that many years ago.

\* \* \* \* \* \*

"Mr. Powell, you can readily see that my plan should be considered by your superiors and perhaps by some one other than they primarily charged with circulation problems. I am naive enough to believe that the general plan outlined is sufficiently big enough to justify its consideration outside of the circulation department as well. At least it is a plan which should not be brushed aside merely because an unknown old man proposes it."

On October 31, 1956, Mr. Van Dyke, Assistant Manager of Time, wrote to plaintiff, and after acknowledging his letters, stated, in part,

"After careful consideration of all your correspondence, which contained the full details of how you intend to operate this special program, it is our decision, and my duty to inform you, that the subscription price of TIME Inc. publications can neither be quoted, nor made available, as part of the listings in your fund-raising subscription proposal."

On November 5, 1956, plaintiff wrote Mr. Van Dyke in which he acknowledged his letter, stating, in part,

"I have yours of October 31, and I am complying with your request to not include your publications in my list in connection with my medical scholarship plan.

"I am hoping that you will reconsider my plan when you have leisure time to think more about it."

Some three months after the Morrow communication, Time accorded plaintiff the right to solicit subscriptions for Time and Life in a letter dated November 29, 1956, which reads as follows,

"Mr. Gilbert Cohen
"Gilbert Bureau of Circulation
"3519 Emerson Avenue South
"Minneapolis, Minnesota

"Dear Mr. Cohen:

"I have your follow-up letter of November 5th and wish to assure you that we have given your medical student scholarship plan further consideration.

"Continuing to play the game with you on a perfectly straightforward basis, I must inform you that it's still our decision not to become actively involved in your plan—in terms of granting you a special remitting rate. However, if you wish to list our magazines and clear resulting orders to us at our regular wholesale remitting rates, for regular terms sold at full published prices, we certainly will accept them on a courtesy basis.
                    "Sincerely,
                    "JACK VAN DYKE
                    "Assistant Manager"

At or about the same time the above letter was written, it appears that plaintiff received notice from the Curtis Publishing Company cancelling whatever authority he had to sell any magazines published by that company, as well as cancellations from the Cowles Magazines, Inc., Hearst Corporation, and Newsweek publications. Notwithstanding these cancellations, plaintiff thereafter in 1957 attempted to put into effect his plan by soliciting subscriptions to Time, Fortune, Gourmet, Life, Ladies Home Journal, Sports Illustrated, and Saturday Evening Post, including Newsweek. He mailed to doctors in various parts of the country some 4,000 circulars and received as a result thereof some six subscriptions, none of which, however, were for the Time or Life publications.

In 1958 plaintiff again sent out soliciting letters exceeding 1,000 in number for subscriptions to various magazines, including Time, Vogue, House and Garden, and Glamour, but the record indicates that he received no subscriptions whatsoever. In 1959 he circulated 1,000 circulations for subscriptions to Vogue, Glamour, House and Garden, Esquire, Good Housekeeping, Newsweek and Popular Mechanics. He received no subscriptions, however.

Thereafter, by letter dated January 5, 1959, he confessed his failure to Life Circulation Co. with respect to his attempt to obtain subscriptions by use of the mails and stated that he intended to change from mail solicitations to direct selling. It was in this letter that he stated that his plan up to that time had been a one hundred per cent failure. But he added,

"However, I am not giving up. I am changing my plan from mail to direct selling, the selling will be by an organization with about 15,000 members the majority of whom are friends of medical education. I am not certain that my plan will appeal to them, but it is worth trying. Frankly, I need your publications. I cannot try it with Conde Nast publications alone. I will succeed much better with your publications. But I can include them at less than 50%. Lunik is out in outer space,— why not take a flier? I am not Lunik. I hope I am not to be judged 'looney' in asking you to ride along with me."

On March 20, 1959, he wrote to the Agency Manager of Time, Inc. in which he outlined his plan to enlist the sponsorship of a new privately endowed medical school to be located at St. Paul, Minnesota, by eighty doctors of that city. He outlined his plan in this regard and stated, in part,

"A three year subscription to Time and Vogue, for example, amounts to $35. A two year subscription to any three of these publications amounting to roughly $35.00 will enable me to give to the school at least $10.00. With only half of the doctors participating the school can have its first million.

"This offer can be made only if you will give me at least fifty per cent remittance rate. I have that rate from Conde Nast."

On July 11, 1959, he wrote to Life that the St. Paul medical school was not ready to accept his plan. But apparently he had not given up his idea to go forward with his program and utilized the publicity accorded the contemplated St. Paul school, stating, in part,

"To overcome the problem of getting the doctors' attention, I make use of a shortened version of the news item itself, leaving out the unessentials of the details. If the doctors will show no interest in the staring headlines to want to read all of it, it will have taught me a lesson."

The "staring headlines" referred to appeared in an article in the St. Paul Dispatch regarding the medical school plan of the St. Paul doctors.

On May 4, 1960, Mr. Goetschius, Manager of the Agency Sales Division of Life Circulation Co., wrote plaintiff in part as follows in answer to one of his letters,

"I have discussed your proposal with Mr. Austell and I am sorry to report that TIME magazine, which currently enjoys a very healthy circulation, does not wish to participate in the plan you propose."

On May 11, 1960, plaintiff wrote to Mr. Goetschius protesting the action of Life.

On May 13, 1960, Mr. Goetschius wrote to plaintiff, stating, in part,

"I have received your letter of May 11th and I am very sorry, but

again I must refuse you permission to include LIFE and TIME in any subscription selling program which would be sold for the benefit of a Scholarship fund."

On July 12, 1960, plaintiff wrote to Mr. Goetschius in part as follows,

" * * * Naturally, I do not wish to take subscriptions which a publisher will not accept because it may be included in my medical scholarship plan which seems objectionable to you."

And on July 15, 1960, Mr. Goetschius replied to Mr. Cohen's letter of July 12th in which he unequivocally stated,

" * * * I should like to state emphatically that our position in regard to your Medical Scholarship plan is simply that we do not want to be represented in it. This means that we do not want to accept subscriptions sold by such a plan from you or any other agency which might try to clear the subscriptions.

"I am sure you realize that any Publisher retains the right to obtain his circulation from the sources of his choice. We are not interested in increasing our Sponsored Circulation."

During the entire period between November, 1956, up to and including May, 1960, plaintiff was authorized to sell Time and Life magazines as outlined in the letter of November 29, 1956, but the record indicates that during that entire period, not a single subscription was obtained for any of the magazines published by these two movants.

The showing made in support of the motion herein by way of depositions taken of the plaintiff, affidavits of Mr. Goetschius, W. O. Morrow, and James L. Hallenbeck, Circulation Director of Life Magazine and President of Life Circulation Co., and the correspondence between the parties, leaves no doubt as to the wholly unfounded claim which plaintiff asserts as to these two movants being part of any conspiracy to remove him from the field of so-called sponsored solicitation agents. The showing made herein has in no way been controverted by plaintiff except by unsupported conclusions which he asserts in his briefs in opposition to the motion. Not a single affidavit has been filed to meet the showing made in support of this motion for summary judgment.

There is no contradiction of the fact that Life and Time afforded plaintiff unfettered opportunity to solicit subscriptions for their magazines from 1956 to the early part of 1960. The showing herein conclusively establishes that any action on the part of Time and Life to refuse to enter into plaintiff's sponsorship circulation plan was without any concert of action or agreement with any of the named or unnamed parties to the alleged conspiracy set forth in the complaint, and when one considers the fact that plaintiff was unsuccessful in selling any subscriptions to Time or Life during a three-year period, it is entirely understandable why these defendants were not attracted to the grandiose subscription plan that plaintiff was attempting to further. Moreover, any baneful conclusions allegedly deducible from Mr. Morrow's memo in referring to plaintiff's pamphlet cannot, on this showing, cast any reflection on Time or Life or justify any inference that their actions were in accord with or prompted by Mr. Morrow's alleged "thumbs down" on plaintiff's circulation plan. Notwithstanding whatever inferences plaintiff seeks to draw from Mr. Morrow's comments, the showing does not indicate that his memo was sent to either Time or Life, and moreover, plaintiff thereafter was permitted to solicit subscriptions for Time and Life magazines for some three years.

The Court on this motion does not assume to analyze all of the alleged aspects of the alleged refusal of other parties to

deal with plaintiff as charged in his complaint. Moreover, the Court has not commented upon certain phases of the complaint with reference to the alleged actions of these movants. Suffice it to say that if there is any merit to plaintiff's cause of action, the showing here overwhelmingly establishes that these movants had no part in the conspiracy alleged. The showing made in support of this motion indisputably establishes that in refusing to accept any subscriptions on the sponsored circulation plan of plaintiff, Time and Life acted independently of any other defendant. Obviously, if they acted on their own appraisal of the merits of plaintiff's subscription scheme, they should not be maintained herein as parties to this conspiracy action.

In closing, it may be observed that there is an absence of any showing that under the Sherman Act the public has been injured by any conduct of Time or Life. Plaintiff remains free to sell subscriptions to these magazines if he desires. The only restriction is that these defendants have refused to be a part of any sponsored circulation plan which plaintiff assumes to promote. How the public has been injured by anything that these movants have done is quite impossible to perceive. And in that plaintiff was not dealing in a commodity, it is difficult to understand how any alleged conduct of these movants in refusing to accord plaintiff the commissions he requested can be considered to be a violation of Section 2 of the Clayton Act. The publishers of these magazines had the right to determine the commissions they would allow plaintiff as their agent.

The Court is convinced that the uncontradicted showing made by these movants justifies the granting of a summary judgment in their behalf, and it follows, therefore, that the motion of Time, Inc. and Life Circulation Co. for summary judgment in their behalf should be, and hereby is, granted. It is so ordered. An exception is allowed.