L. Gilbert COHEN, Plaintiff,

v.

CURTIS PUBLISHING COMPANY, Curtis Circulation Company, Time, Inc., Life Circulation Co., Cowles Magazines, Inc., The Hearst Corporation, Newsweek, Inc., Defendants.

No. 4-60 Civ. 265.

United States District Court
D. Minnesota,
Fourth Division.

Sept. 19, 1963.

See also 31 F.R.D. 569, aff. 8 Cir., 312 F.2d 747.

Edward C. Stringer (of Stringer, Donnelly & Sharood), St. Paul, Minn. (McCauley, Henry & Brennan, New York City, of counsel), for Hearst Corp.

John L. Hannaford (of Doherty, Rumble & Butler), St. Paul, Minn. (Pepper, Hamilton & Scheetz, Philadelphia, Pa., of counsel), for Curtis Pub. Co. and Curtis Circulation Co.

Lawrence C. Brown (of Faegre & Benson, Minneapolis, Minn.), for Cowles Magazines, Inc.

L. Gilbert Cohen, Minneapolis, Minn., appeared pro se.

NORDBYE, District Judge.

The Court heretofore has considered and granted a motion for summary judgment on behalf of Time, Inc., and Life Circulation Company, which were joint defendants with the moving defendants herein. That opinion is to be found in 31 F.R.D. 569. A recital of certain factual matters and reference to some of the correspondence in that decision is applicable here, and instead of repeating it, the Court adopts that opinion as part of the decision herein.

There are certain factual differences, however, as between the dealings by Cohen with Time and Life and his dealings with these defendants. These differences will be made to appear as the Court sets forth the salient dealings between Cohen and each of these moving defendants.

The three principal factors upon which plaintiff's claim is bottomed may be summarized as follows:

1. That the moving defendants are members of the Central Registry, magazine subscription solicitors, an unincorporated association sponsored by the Magazine Publishers Association. These defendants are alleged to have received a memorandum from one Mr. Morrow, Secretary of the Central Registry, directed to circulation directors advising them of plaintiff's medical scholarship plan, and this

memorandum is claimed to be the warning which precipitated the refusal of these moving defendants, acting together, to grant Cohen the right to solicit subscriptions for his medical scholarship plan.

2. Agencies involved in selling "sponsored circulation" are classified as "D" agencies by the Central Registry and plaintiff alleges that, by agreement, only publishers are allowed to engage in this mode of solicitation, which deprived him of that method of selling.

3. Some magazine subscription agencies receive better commissions than Cohen was offered; hence, he urges price dicrimination.

The moving defendants contend:

1. That the affidavits filed in their behalf unequivocally establish that each of the moving defendants acted independently of each other in dealing with Cohen.

2. That plaintiff had no business or property upon which a finding of a Sherman Act or Clayton Act violation could be supported, and plaintiff had no business or property which could have been damaged by anything defendants are alleged to have done.

3. That the cause of plaintiff's failure was his own inability to get any support for his medical subscription plan. In other words, assuming that there was anything wrong which defendants did, or any conspiracy or concert of action to prevent Cohen from obtaining the right to solicit subscriptions for the magazines published by the defendants, such action was not a proximate cause of any damage plaintiff may have sustained. That is, according to the defendants, plaintiff's failure to pro-

mote the medical scholarship plan successfully was due to his own inability to attract anyone to adopt it.

4. As to price discrimination, plaintiff attempts to come within and under Title 15, Section 13(a), United States Code, which provides:

"It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States * * *."

Plaintiff was not, according to the defendants, a purchaser of a commodity, that is, the usual buy and sell arrangement is wholly lacking in his venture to interest magazine publishers to engage him as a solicitor for subscriptions to their magazines.

5. In addition, defendants point out that while sponsored circulations carried on by publishers are designated in the Central Registry by the letter "D", the showing indicates that the sponsored circulation is not reserved for publishers. Moreover, if the defendants decided that the best results could be obtained by limiting their sponsored circulation to magazine publishers, the defendants urge that they are accorded that right. Federal Trade Commission v. Curtis Publishing Company, 260 U.S. 568, 43 S.Ct. 210, 67 L.Ed. 408.

## THE HEARST CORPORATION

It was on May 11, 1955, that Cohen addressed a letter to "Circulation Manager, Hearst Magazines" seeking to act

for it as a "wholesale subscription agency." On May 17, 1955, District Manager M. C. McConnell answered, stating that Hearst was willing to permit Cohen to take subscription orders on a commission basis. On May 19, 1955, Cohen replied, stating that he wanted to act as an agent or as an agency for Hearst in his immediate territory. On May 24, 1955, one Victor E. Berger, a superior of McConnell, answered Cohen, stating that Hearst had no subscription plan for a small agency such as his, but that it would permit him to act as a part-time representative working on a commission basis, as outlined in McConnell's letter of May 17, 1955. On June 3, 1955, Cohen answered Berger stating again that he wanted to act as a wholesale agency. On June 6, 1955, Berger answered, stating that Hearst was willing to extend him the same rates made available to any person starting in the subscription business. On June 9, 1955, Cohen answered, arguing that while he "left the circulation field several decades ago," he felt that he was entitled to begin on a wholesale agency basis. On June 28, 1955, Cohen wrote Berger reiterating his request for recognition as an agent of Hearst on a basis higher than a mere beginner's commission. On August 23, 1956, Berger wrote Cohen that the Magazine Publishers Association had brought to his attention Cohen's "Self Perpetuating Medical Scholarship Plan" based upon subscription sales to doctors throughout the country. He stated that Cohen had included therein under the heading "Leading Publications Which Make This Project Possible," two of their publications, namely, Good Housekeeping and Sports Afield. He notified Cohen that he should accept the letter "as our notification that you are not to include any of our publications, shown above, in your plan or any mailings you may make, and further that any authorization you may have had, either assumed or implied, is cancelled as of this date."

The memorandum directed to circulation directors by Mr. Morrow, Secretary of the Central Registry, under date of August 17, 1956, with respect to Cohen's medical scholarship plan, reads as follows:

"A letter dated July 15, 1956, from L. Gilbert Cohen, manager of subject agency has come to our attention. The subject of this letter is 'Doctors' $1,000,000 Self Perpetuating Medical Scholarship Fund at No Cost to Any One.'

"We quote further from Mr. Cohen's letter as follows:

" 'We will pay into the fund 20% of the subscription price of the magazines to which doctors usually subscribe for home and office. It is estimated that this will amount to $5.00 per doctor. With only half of the 180,000 doctors participating this can mean $500,000. by the end of 1956 and another $500,000. by the end of 1957. As long as publishers will pay commissions the Fund will keep growing. Doctors incur no additional expense in giving us their subscriptions.

" 'The Fund will make loans to medical students on longeasy terms. The repayment of the loans will perpetuate the fund.'

"In the postscript the statement is made that their charge for handling subscriptions to medical journals is 50¢ and any excess commissions would be turned into the Fund.

"We thought you would want to have the above information."

On October 1, 1956, Cohen wrote Berger protesting his letter of August 23, 1956, and asked him to reconsider. The next letter appearing in the record is dated June 27, 1960, when Cohen wrote Berger as follows:

"In 1956, after Magazine Publishers Association acquainted you with my medical scholarship plan, you cancelled my authority to take subscriptions for your publications.

"Presumably you had sufficient and valid reason for such action,

even though you never thought it worth while to tell me why you did that.

"Perhaps it was the existing conditions at the time which made your action justifiable. Since conditions change with the times, I am taking the liberty of asking you whether it may now include your magazines in my plan?

"No publisher has voiced any objection to the plan itself,—at least Mr. Morrow stated that. None has told me they did not like my plan. I am hoping that a few important publishers still think well of my plan and that this time it will be OK to include their publications in my medical scholarship plan, yours among them."

It should be noted that when Berger wrote his letter of August 23, 1956, informing Cohen that Hearst withdrew any authorization to him to take subscriptions for Hearst magazines, Cohen never had been authorized to include Good Housekeeping and Sports Afield as publications which allegedly made his medical scholarship fund possible. As of that time, the only authority Cohen had received was to act as an ordinary subscription agent for Hearst publications as any agent might do.

On July 11, 1960, Cohen wrote Berger asking him if he still refused to have Hearst magazines included in his medical scholarship plan. On July 14, 1960, Berger wrote Cohen stating that "As previously stated, we are not interested in including any of our publications in your medical scholarship plan." On July 21, 1960, Cohen wrote Berger urging reconsideration by Hearst of his medical scholarship plan for obtaining subscriptions, and on August 20, 1960, Cohen wrote to John R. Miller, Vice President and General Manager of Hearst Magazines Division of the Hearst Corporation, asking him to contact Mr. Berger with the "view of having him look more kindly on my project." On August 26, 1960, Miller acknowl-

edged receipt of Cohen's letter of August 20, stating,

"This will acknowledge your letter of August 20th requesting authorization to list our publications in your campaign to raise a large medical scholarship through the sale of subscriptions of magazines to doctors for their homes and offices.

"We do not wish to include our magazines in a campaign of this type inasmuch as the circulation would be termed as sponsored business. However, we do appreciate your thinking of us in formulating your organization."

On August 30, 1960, Cohen wrote Miller, stating, in part,

"I thank you for yours of August 26th. Since my plan is an original one and while it may at first glance seem similar to sponsored circulation there are distinguishing elements in it because of which it can not be considered sponsored circulation.

"In support of this view I am attaching a review of the facts supporting my proposition that it does not come in the sponsorship classification.

"I trust you will give it the consideration I believe it deserves and submit it to the ABC for the consideration by the body usually passing on such matters. It should not be left to any one individual there."

This letter apparently was written because Cohen allegedly had received information from someone that his rejection by the publishers was due to the fact that they did not want to be tied up with him on any sponsored circulation plan. On September 1, 1960, Miller wrote Cohen acknowledging his August 30th letter and stated that "We have again reviewed this matter and do not wish to include our magazines."

Cohen has produced no evidence whatsoever that the decision of the Hearst officials was prompted by anything

but an independent determination that they did not care to deal with Cohen on any subscription agency basis other than to permit him to act as an ordinary agent with the established commissions. A review of the Hearst correspondence with Cohen completely dispels any theory of conspiracy or combination by Hearst, or any understanding with others in doing that which it did with reference to Cohen's persistent requests. When Cohen wrongfully took it upon himself to claim that two of Hearst's publications were sponsoring his medical scholarship subscription plan, the refusal of Hearst to deal with him further in any capacity completely and convincingly disproves the theory that the Morrow memorandum brought about any agreement by Hearst with others to deny Cohen the right to take subscriptions for his scholarship plan.

The medical scholarship plan devised by Cohen never was in operation and that was not due to any failure of the defendants to give him the right to solicit subscriptions to their magazines, but was due entirely to Cohen's inability to put his plan across. It may be noted that Cohen had been away from the magazine business for some 35 years. He now is 85 years of age, and when he initiated this plan in 1956 he was 78 years of age. He candidly admits in his deposition that the publishers cannot be held responsible for his failure to obtain approval for his medical scholarship subscription plan. However, he does contend that that which he did was only testing, and his failure to obtain any response from the medical fraternity was not, in his opinion, the end of his dreams in this regard.

## CURTIS PUBLISHING COMPANY
## CURTIS CIRCULATION COMPANY

In 1954, one Hamry, District Manager of Curtis Circulation Company, appointed Cohen as a subscription independent contractor upon condition that Cohen furnish a bond, that is, a fidelity bond, and authorized him to solicit for subscriptions on a commission basis of 55 per cent on magazines published by Curtis and 45 per cent on magazines published by other publishers, with the subscriptions to be handled by Curtis. Mr. Cohen contends that in a conversation with Mr. Hamry in 1955 he disclosed his medical scholarship plan, and he states that Hamry did not disapprove it. Apparently Cohen was not successful in obtaining a bond and he did not fulfill any arrangement with Hamry. The correspondence between Cohen and Curtis is enlightening. On September 12, 1956, Curtis Circulation Company wrote Cohen in part as follows:

"Information has reached us which indicates that you may be offering doctors the opportunity to subscribe for the Saturday Evening Post, Ladies Home Journal, Holiday, and Jack and Jill magazines through your agency; with a promise to pay 20% of the subscription price to the 'Doctors' Self Perpetuating Medical Scholarship Fund'.

"A careful search fails to disclose any record of our having granted you authority to list, sell or clear subscriptions to Curtis publications.

"This letter will serve to notify you that any authority which you have to sell subscriptions to Curtis publications is hereby withdrawn immediately."

On September 20, 1956, Cohen wrote one E. O. App, Manager Agency Production, Curtis Circulation Company, protesting the action taken in the letter of September 12th and stated that he already had suggested that Curtis sponsor the plan and call it the "Curtis Medical Scholarship Plan." He further stated that he had not represented that he was acting for Curtis in that he had been unable to procure a bond. Then he commented anent the suggestion of the name "Curtis Medical Scholarship Plan" as follows:

" * * * Does that prove that I was acting and wanted to act as an

independent agency? My name may give the impression that I am a big shot in the circulation field. It is merely a prestige name in order to get attention. How could I talk of a $1,000,000 fund by saying: 'Gentlemen, I am 72 years old and if you will do that for me, I will make you a $1 million'?

"You must take into consideration that even if there were, I mean if I knew of another way to indicate that I was acting as the agent of Curtis, I would be sticking my neck out because I had no written authority because of the bond problem."

The above-quoted letter is not entirely clear, but it may be assumed that Cohen was attempting to inform Curtis that he never was authorized to solicit subscriptions for Curtis magazines and wanted App to give the matter further consideration. In any event, on September 24, 1956, App wrote Cohen stating that "we must refuse to grant your request to list, sell or clear subscriptions to Curtis publications." On September 27, 1956, Cohen wrote App stating, in part, "Why deprive me of making some money when I am not hurting you but rendering you a good service." And on May 6, 1958, Cohen wrote App stating that "I have not yet given up my idea of building a large medical scholarship fund which was the cause of your cancelling my authority to include Curtis publications." On May 7, 1958, App wrote Cohen in reply,

"Our refusal of your request for authority to sell subscriptions to Curtis publications was and is based on the fact that Curtis circulation policy forbids the acceptance of subscriptions produced by such a plan as you have outlined. It is, therefore, necessary to again refuse your request for authority to sell subscriptions to Curtis publications.

"However, Curtis has no interest or control over the actions of any other publisher. It is up to each and every publisher to decide for himself whether or not circulation produced under a plan such as you have in mind would be acceptable."

On May 16, 1958, Cohen wrote App protesting the attitude of Curtis and indicated that Curtis must have some animosity towards him. On August 6, 1958, Curtis wrote Cohen in part that there was no discrimination in its decision as to him and that Curtis Circulation policy "does not permit the use of a plan involving sponsorship, except it being under the supervision and direction of a Curtis full time staff."

On August 12, 1958, Cohen wrote one W. F. W. Christian, of the Curtis Publishing Company, stating that his plan for medical scholarship did not fall within the definition of sponsored circulation, and on July 11, 1960, Cohen wrote App asking if Curtis still refused to go along with him on the medical scholarship plan. On July 15, 1960, Cohen was informed by Curtis that the policy of Curtis had not changed. Thus, the conclusion is impelling that in its dealings with Cohen the action of Curtis was the mere exercise of a publisher's right to determine who should represent it in the solicitation of subscriptions on a sponsorship plan basis.

COWLES MAGAZINES, INC.

This defendant publishes Look magazine and also operates a division known as the Independent Sales Division, which is engaged in the sale through independent agents of subscriptions to Look magazine and to magazines published by other publishing companies. Apparently Cowles also has a wholly owned subsidiary known as Civic Reading Club, Inc.

It was as early as September 29, 1954, that the Assistant Subscription Manager, L. S. Leach, of Cowles, wrote to Cohen refusing to authorize him to sell Look magazine on any so-called sponsorship plan. This was almost two years before the Morrow letter:

"In your letter of September 8th you informed us that you were planning on going after organization

sponsored business, particularly schools, and then in your letter of September 21st you say that you do not contact any schools.

"Actually, whether or not you would be contacting schools, we could not allow you to sell LOOK on either a school plan or on any 'organization' plan. The only type of sponsored business we accept on LOOK is that which is sold through schools.

"There are many other good books which I am sure you can get on this type of an operation, and we certainly wish you the best of luck."

Cohen apparently did not reply to this letter until some time in 1955 when he wrote a Mr. Suhler, Vice President and Subscription Manager, as follows:

"Last year when I asked for a rate you declined to give it because I was dabbling in sponsored circulation.

"This year I am not catering to organizations, only local agents. I am therefore requesting a 50% rate, so that I can profitably handle agents' business. I am not asking for 60% at the present time. I can not promise that I may not ask for a 10% bonus later if the volume will justify such a request."

On September 1, 1955, Suhler wrote Cohen as follows:

"We are glad to know that you are interested in subscription sales on LOOK now that you have discontinued your sponsored type selling.

"The prices and rates shown on the attached confidential rate sheet are for your use in selling and clearing LOOK subscriptions to us. These are the best rates we can give you."

On September 3, 1955, Cohen wrote Suhler as follows:

"When you tell me: 'These are best rates we can give you', you positively admit these rates are not best you can give and do give agencies.

"Why discriminate against me? The matter of fact is that catalogue agencies quote Look at $2.70 instead of $2.80. But that is not the point,—it may be an error. I think I have made it clear that I am not a canvasser going among friends asking the favor of placing a subscription with me.

"I am trying to establish a small agency working with local agents. It seems that it is your policy to dissuade others from entering the wholesale subscription field. Why? What do you gain by confining the subscription agency business to the few in the class of Turner or Crowley, etc.?

"Last year you declined to have me handle Look on the Sponsorship plan because Curtis used it. I have since learned that Look was not on their sponsored list as far as organizations are concerned. It was on their phone department,—whatever that be.

"Frankly I do not understand the reason for your madness. You go to the expense of organizing a pay as you go organization and lay out cash in advance for signed orders, have office overhead and pay 20% to the collector. Despite all that expense you have the effrontery to offer a paid cash in advance subscription salesman only 20% when as a matter of fact your net on your Curtis and your pay as you go plan does net you 25%.

"I have said nothing you do not know already. Now that we both know it and know that the other knows it, why not do business on a fair basis? I hope this deserves a reply at which I shall take no offense at whatever you wish to say.

"However, publishers like yours preaching fair dealing, etc., should be equally fair in their dealings with the little fellow,—instead of practicing monopolistic practices in keeping the small fellow out of the business of selling subscriptions on

an equal footing with others. Where is a department store entitled to a better rate than a small agency? I hope you will recognize the fairness of my writing even though it is not worded diplomatically."

· On September 6, 1956, Curtis Circulation Company wrote to the Civic Reading Club, Inc., the subsidiary of Cowles, attention of Mr. Leach, as follows:

"We are informed that an agency, Gilbert Bureau of Circulation, 3519 Emerson Ave. South, Minneapolis 8, Minn., L. Gilbert Cohen, Manager, has offered subscriptions to Curtis publications to doctors, on the basis of paying 20% of the subscription price into a 'Doctors' $1,000,000 Self Perpetuating Medical Scholarship Fund at No Cost to Anyone.'

"This letter is to inform you that the Gilbert Bureau of Circulation, or L. Gilbert Cohen, is not authorized to sell subscriptions to Curtis publications, and we will not knowingly accept subscriptions which L. Gilbert Cohen or the Gilbert Bureau of Circulation may attempt to clear through any authorized agency.

"Please mark your records accordingly and acknowledge receipt of this notice."

On January 31, 1957, Leach wrote Cohen as follows:

"I appreciated the opportunity to talk to you on the telephone yesterday.

"As I explained to you then, we have a very serious problem of over production on LOOK for many months to come because of the transfer of Collier subscribers to LOOK.

"You can be sure that at any time we might need additional production, we will be glad to reconsider your request to sell LOOK in your sales plan. Until that time, we cannot give you authorization to sell LOOK."

And again on February 5, 1957, Cohen wrote Leach as follows:

"I have yours of January 31, and I wish to express my appreciation for the courtesy shown in your talking and correspondence with you. I appreciate it the more because I have found courtesy somewhat of a rare species among circulation managers who have committments with Curtis.

"I hope that you will realize that I have reasonable grounds (reasonable to a fellow who is on the outside trying to get a look inside) to justify my belief that your fear of shortage of paper is much too apprehensive. When you took over Collier's subscriptions you also took over Collier's paper supply and contracts for future delivery. Collier's supply of paper was ample to take care of its needs.

"Still looking from the outside, this seems apparent. You have changed your minds about wanting more sponsored circulation. Now you want all you can get and want it to the extent to retain the entire Collier circulation staff. If you were in my position and I in yours, would you feel that my refusal to accept subscriptions under this plan was justified? I think you would feel just as I do and wonder why the other fellow does not see it your way. You too would feel you are being discriminated against for a reason you can not understand but which is subject to implication from the obvious facts.

"You would wonder just as I do why a project like this holding forth great benefits to mankind can be destroyed for no other reason than that it appeared to Mr. Morrow, that I was acting as *INDEPENDENT* agent. Mr. Morrow could have learned the facts if he asked you for it (you, being still me). You would wonder why Curtis with millions of sponsored circulation as

it is, cancels 'any authority you may have had' because of it. Curtis offered no excuse. It even notified wholesale agencies not to accept subscriptions from me. Why, presumably, it is a crime to act as an independent agent. Curtis' belief in free enterprise is freedom for itself only. What would you do if you were in my place?"

### IN GENERAL

Cohen contends that the Morrow memorandum was the notice which precipitated action by Hearst and Curtis in the fall of 1956. It does appear that Hearst terminated Cohen's authority to act for it in any capacity on August 23, 1956, and Curtis on September 12, 1956. Curtis wrote to Civic Reading Club, Inc., on September 6, 1956. Cowles, however, had made its views known to Cohen in 1954 as to sponsorship subscription solicitation. Any mere parallel conduct under the circumstances here as between Curtis and Hearst cannot be considered as evidence of a conspiracy or concert of action among them, particularly when the facts unequivocally establish that any other consideration of Cohen's plan by these publishers would have been utterly imprudent. And as to Hearst, Cohen already had assumed to state incorrectly that the former had approved his plan. Each of these defendants has filed an affidavit herein which convincingly refutes Cohen's theory as to a conspiracy or concert of action among them to refuse to go along with him on his medical scholarship plan. Moreover, notwithstanding letters from Hearst and Cowles in August and September, 1956, Cohen went forward with his attempt to further his medical scholarship fund as is evidenced from the correspondence referred to above, and in 1957 he attempted to effect his plan and solicited subscriptions to Time, Fortune, Gourmet, Life, Newsweek, Ladies Home Journal, Sports Illustrated and the Saturday Evening Post. At or about this time, he mailed to doctors in various parts of the country some 4,000 circulars and received as a result 6 subscriptions to magazines. In 1958, he sent out a circular for subscriptions to Time, Vogue, House and Garden, and Glamour magazines, stating that "We take subscriptions for all magazines. Give us your magazine subscriptions." In a letter to Life Circulation Company, he admitted that in 1958 his mailing had been a 100 per cent failure, but he proposed to change his plan from mail to direct selling. In 1959, he mailed 1,000 circulars for subscriptions to Vogue, Glamour, House and Garden, Esquire, Good Housekeeping, Newsweek and Popular Mechanics. This circular stated that "We take subscriptions for all publications." He received no subscriptions in response to this circulation. From all of his four mailings in 1955, 1957, 1958 and 1959, he received only a handful of subscriptions. He never received any sponsorship of his plan from any medical school, associate, or group. The University of Minnesota had turned down his plan. He did make tentative plans in 1959 to solicit the sponsorship of a privately endowed medical school located at St. Paul, but that plan did not materialize. It was Cohen's inability to put his plan across among the doctors which spelled its doom—not the fact that these defendant publishers refused to sponsor it.

Cohen's letter of July 15, 1956, to which Mr. Morrow referred in his memorandum, would fully warrant any publisher to steer away from any connection with the proposed plan. Indeed, under the uncontroverted circumstances, it would have been foolhardy for any of these defendants to become a party to the scheme. Here we have an aged individual, who was unable to procure an ordinary magazine agent's bond, and with no financial responsibility whatsoever, attempting to foster a million dollar scholarship fund. And if any of these publishers had become a party to his plan and it had failed, just as the record now demonstrates that it did, these defendants would have had to bear the onus and responsibility of being parties thereto. It seems inconceivable that any

experienced magazine publisher would become a party to a plan where an individual such as Cohen assumes the responsibility of handling this proposed amount of money and entrust him to turn over some 20 per cent of the subscription price of the magazines to a so-called medical scholarship fund which had no sponsorship or backing from any school or group interested in its objectives.

The correspondence between Cohen and Hearst, Cowles, and other publishers establishes that long before Mr. Morrow's memorandum, Hearst had limited Cohen's activities to act as a mere soliciting agent and when Cohen claimed that Hearst had approved Good Housekeeping and Sports Afield as sponsors of his plan, it surely had the undeniable right to determine whether it should participate therein. Similar observations may be made with reference to Curtis and Cowles. Both of these publishers had the right to terminate their relationship with Cohen when it appeared inadvisable to do business with him. Cowles did just that in 1954 with reference to its participation in any sponsorship solicitation plan promoted by Cohen.

■■ At the time these defendants cancelled any relationship with Cohen as to his right to solicit subscriptions for their magazines, Cohen had no business or property as to which a finding of damages by reason of a violation of the Sherman Act or Clayton Act could be supported. Cohen apparently relies upon a number of well-recognized decisions that where damages have been sustained by the wrongful conduct of another or others, it is held that the mere fact that the amount of damages may be uncertain, the wrongdoer must respond nevertheless and cannot be relieved of damages even though some speculation or uncertainty arises in the determination thereof. But we do not have that situation here for the simple reason that Cohen had no property or business which was subject to any damage by reason of violation of the antitrust laws. Duff v. Kansas City Star Company, 8 Cir., 299 F.2d 320. And his claim of price discrimination is baseless in view of the admitted circumstances. These defendant publishers had the right to determine the amount of commissions to be allotted to him as a soliciting agent. Plaintiff's entire claim for damages is based upon sheer speculation.

In that plaintiff is a layman and is acting as his own lawyer, the Court has set forth with more than usual detail much of the correspondence reflecting the dealings between the parties in order to demonstrate that this case as to these moving defendants is ripe for the granting of a summary judgment, and the Court is clear that the record will permit no other conclusion. Defendants and each of them are entitled to judgment as a matter of law in that there is no genuine issue of fact to be determined.

It follows, therefore, that a summary judgment in behalf of these moving defendants, and as to each of them, must be granted. It is so ordered. Exceptions are allowed.